UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

OBEX SECURITIES, LLC,

          Plaintiff,

   - against -

HEALTHZONE LIMITED,

        Defendant.

------------------------------------------------ X

**OPINION AND ORDER**

**10 Civ. 6876 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/3/11_

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

      OBEX Securities, LLC ("Obex") brings this diversity action against Healthzone Limited ("Healthzone") for Healthzone's failure to pay placement fees allegedly owed to Obex under the parties' Consulting Assignment (the "Agreement"). Following this Court's grant of partial dismissal, Obex's sole remaining claim is for breach of contract.[1] Healthzone now moves for summary judgment claiming that Obex has failed to show that the Agreement was breached. For the following reasons, Healthzone's motion is granted.

---

[1]    *See Obex Secs., LLC v. Healthzone Ltd.*, No. 10 Civ. 6876, 2011 WL 710608 (S.D.N.Y. Feb. 28, 2011).

1

## II.     BACKGROUND[2]

### A.     The Parties

Obex is a Delaware limited liability company that provides financial services with its principal place of business in New York.[3]  Healthzone is an Australian company that distributes, produces and retails health and household products with its principal place of business in Australia.[4]  Also relevant to this proceeding, Westminster Securities ("Westminster") is a Delaware corporation that provides financial services with its principal place of business in New Jersey.[5]  On approximately February 25, 2009, Westminster was acquired by another financial services company, Hudson Securities, Inc., and now operates as a division of

---

[2]     Healthzone has submitted a written statements of facts pursuant to Local Civil Rule 56.1.  *See* Defendant Healthzone's Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1").  Because Obex has failed to submit a reply statement admitting or denying the facts alleged by Healthzone as required by Local Civil Rule 56.1(b), the facts in Healthzone's 56.1 Statement are deemed true.  *See* Local Civil Rule 56.1(c).  Accordingly, the facts in this case are taken from Healthzone's Rule 56.1 Statement as well as the pleadings and depositions submitted by the parties.  All inferences are drawn in Obex's favor for the purpose of this motion.

[3]     *See* Complaint ("Compl.") ¶ 5.

[4]     *See id.* ¶ 6; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 4.

[5]     *See* Compl. ¶ 7.

Hudson.[6]

**B.    The Agreement**

In 2009, Healthzone hired Robert Dulhunty of Development Capital Corporation ("DCC"), an Australian investment banking firm, to assist Healthzone in raising capital.[7]  Dulhunty had formerly been a member of Healthzone's board of directors, but he was removed in order to eliminate any conflicts of interest.[8] Healthzone believed it could effectively raise capital by issuing equity to investors in North America, and Dulhunty was authorized to represent Healthzone in this endeavor.[9]  Dulhunty concluded that Obex would be a suitable partner to assist Healthzone with raising capital in North America and on September 25, 2009, Obex and Healthzone entered into the Agreement.[10]

Under the Agreement, Obex agreed to, among other things, advise Healthzone regarding the conditions and terms of any proposed financing, and

---

[6]      *See id.* ¶ 8.

[7]      *See id.* ¶¶ 9-11.

[8]      7/28/11 Deposition of Peter D. Roach, Chief Executive Officer of Healthzone ("Roach Tr.") at 34:13-20, Exs. 2, 3, 5, 6 and 7 to 10/10/11 Certification of Richard S. Meisner, counsel for Obex ("Meisner Cert.").

[9]      *See* Compl. ¶¶ 10, 14.

[10]     *See id.* ¶¶ 16-18.

identify, approach and evaluate suitable prospective investors.[11]  In return,

Healthzone agreed to pay Obex a number of placement fees including "nine

percent (9.0%) of gross funds raised by Obex."[12]  The Agreement specifically

provided that "Obex shall be entitled to Placement Fees on all amounts invested in

the Company [Healthzone] by entities based in North America or offshore

domiciles, but not in the Australasia region and introduced to the Company by

Obex ('Obex Parties')."[13]  The Agreement also included a clause to prevent

Healthzone from meeting prospective investors through Obex and then avoiding

placement fees by terminating the Agreement: "Obex shall be entitled to Placement

Fees on all future investments by Obex Parties, even if such investments occur

after the termination of the Agreement."[14]  The Agreement further provided that

"[t]his agreement may not be amended or modified except in writing" and that any

disputes would be submitted to the United States District Court in New York

---

[11]     *See* 9/25/09 Consulting Assignment (the "Contract") ¶ 2, Ex. A to
9/19/11 Declaration of Brian J. Neville, counsel for Healthzone ("Neville Decl.");
also included as Ex. 1 to Meisner Cert.

[12]     *Id.* ¶ 6(b).

[13]     *Id.*

[14]     *Id.*  Obex refers to this as the "anti-circumvention" clause.  *See* Pl.
Mem. at 2.

4

City.[15]  The Agreement also established Obex as Healthzone's non-exclusive broker-dealer.[16]  Finally, the Agreement could be terminated at the written request of either party.[17]

### C.    The Alleged Breach

Prior to the Agreement, Obex had identified Westminster as a broker-dealer that could be employed to assist Healthzone in its capital-raising efforts.[18] Obex introduced Westminster to Healthzone with the idea that Westminster would help market and distribute Healthzone securities.[19]  After the Agreement was executed, Obex and Westminster engaged in talks about working together in Healthzone's capital-raising efforts, and sharing the nine-percent placement fees that Healthzone would pay Obex.[20]  Healthzone, however, terminated the Agreement with Obex by written letter on October 26, 2009 and discontinued

---

[15]    Contract ¶ 19.

[16]    *See* 7/25/11 Deposition of Randy Katzenstein, Chief Executive Officer of Obex, ("Katzenstein Tr.") at 249:18-21, Ex. C to Neville Decl.; 10/7/11 Certification of Alice M. Rooney, Chief Operating Officer and Chief Financial Officer of Obex ("Rooney Cert.") ¶ 26.

[17]    *See* Contract ¶ 16.

[18]    *See* Pl. Mem. at 7; Rooney Cert. ¶ 12.

[19]    *See* Pl. Mem. at 7.

[20]    *See id.* at 9; Rooney Cert. ¶ 25.

using Obex to raise capital in North America.[21]

Healthzone subsequently engaged Westminster as its new broker-dealer, and with Westminster's help placed nearly thirty-five million shares of Healthzone securities, raising approximately eleven million dollars.[22]  Healthzone paid Westminster a commission of seven-percent of the capital raised, and also agreed to pay DCC a commission of nine-percent on funds raised as well as a weekly fee.[23]  Healthzone never paid any placement fee to Obex.[24]  It is undisputed, however, that no party that Obex introduced to Healthzone — including Westminster — ever invested in Healthzone.[25]  It is also undisputed that the parties never made any written amendments to the Agreement.[26]

Obex then instituted this action claiming that Healthzone owed

---

[21]    See Def. 56.1 ¶ 11; see also E-mail communications between Dulhunty and Obex, Exs. C and D to Rooney Cert.; 10/26/09 Termination of the Mandate, Ex. 17 to Meisner Cert.

[22]    See Pl. Mem. at 11; Rooney Cert. ¶ 36.

[23]    See Roach Tr. at 41:22-42:25; 10/28/09 Capital Raising Mandate, Ex. 18 to Meisner Cert.

[24]    See Katzenstein Tr. at 242:13-243:3.

[25]    See id. at 224:23-245:9, 253:2-8; 7/26/11 Deposition of Alice M. Rooney ("Rooney Tr.") at 115:6-15, 181:6-23, Ex. D to Neville Decl.; Rooney Cert. ¶ 13.

[26]    See Def. 56.1 ¶ 10.

6

placement fees to Obex on any amounts invested in Healthzone by parties that Westminster introduced to Healthzone.[27]  Obex argues that the Agreement was ambiguous concerning which entities constitute "Obex Parties," and that the Court should find — or at least consider external evidence — that any party introduced to Healthzone by Westminster was an Obex Party because Westminster itself was introduced to Healthzone by Obex.[28]  If Westminster and its clients are indeed Obex Parties under the Agreement, Obex would be entitled to nine-percent placement fees on the portion of the approximately eleven million dollars that Westminster's clients invested in Healthzone prior to Healthzone's termination of the Agreement.[29]

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[27]     *See* Pl. Mem. at 17.  Obex refers to the situation where a broker-dealer introduces another broker-dealer that leads to an investment as an "indirect introduction."  *Id.*

[28]     *See id.* at 15, 18; Rooney Tr. at 181:6-23 ("I believe that Healthzone breached the mandate because they were obligated to pay OBEX for transactions resulting from OBEX parties, which included Westminster *and its clients*.") (emphasis added).

[29]     *See* Pl. Mem. at 2.

a matter of law."[30]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit  under the governing law.'"[31]

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[32]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[33]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[34] and "'may not rely on conclusory allegations or unsubstantiated

---

[30]     Fed. R. Civ. P. 56(a).

[31]     *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

[32]     *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[33]     *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[34]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

8

speculation.'"[35]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[36]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[37] "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[38]

## IV.   APPLICABLE LAW[39]

To make out a breach of contract claim under New York law a plaintiff must show "(1) the existence of a contract between itself and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3)

---

[35]   *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[36]   *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

[37]   *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[38]   *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[39]   New York law governs this dispute pursuant to the Agreement.  *See* Contract ¶ 19.

breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach."[40]  "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous."[41]  "[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."[42]

"Whether a contract is ambiguous is a question for the court. . . . The interpretation of an unambiguous contract . . . is also a question of law reserved for the court."[43]  "It is well settled that [a court's] role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract.  If

---

[40]     *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) and *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

[41]     *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).

[42]     *Id.* (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138-39 (2d Cir. 2000)).

[43]     *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514-15 (2d Cir. 2001) (citing *Van Wagner Adver. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 190 (1986)).  *Accord Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011) ("The question of whether the language of a contract is clear or ambiguous is one of law, and therefore must be decided by the court.") (quotation marks omitted).

that intent is discernible from the plain meaning of the language of the contract, there is no need to look further."[44]  In other words,

> Ambiguity is determined by looking within the four corners of the document, not to outside sources. . . .  The entire contract must be reviewed . . . in the light of the obligation as a whole and the intention of the parties as manifested thereby. . . .  Where the language chosen by the parties has a definite and precise meaning, there is no ambiguity.[45]

Thus, "[w]hen parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms."[46]

## V.   DISCUSSION

### A.   The Agreement Was Not Ambiguous

The consideration of external evidence about the meaning of the Agreement is not justified here because the terms of the Agreement could not have been clearer.  Under the plain language that the parties adopted, Obex was entitled to a percentage of all amounts invested in Healthzone provided that three conditions were met:  (a) an entity based in North America or offshore domiciles, but not in the Australasia region (b) that was introduced to Healthzone by Obex (c)

---

[44]   *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004).

[45]   *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (quotation marks and citations omitted).  *Accord JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

[46]   *Riverside S. Planning Corp.*, 13 N.Y.3d at 403.

11

invests money in Healthzone.[47]  According to the Agreement, only an entity that met all three of these conditions could qualify as an "Obex Party," thereby entitling Obex to placement fees.[48]  There is no contractual language that entitles Obex to placement fees on investments by entities which Obex did not introduce to Healthzone.

While Obex contends that it is customary in the financial services industry to award placement fees on investments obtained through indirect introductions,[49] such alleged custom is irrelevant where there is an unambiguous contractual provision.  It is undisputed here that:  (1) Westminster never invested any money in Healthzone, and (2) Obex never introduced any entity other than Westminster to Healthzone.  Therefore, under the Agreement, Obex has no claim for placement fees on any of the capital that was later invested in Healthzone by Westminster's clients.  Moreover, because the Agreement was non-exclusive, Obex cannot argue that Healthzone acted unlawfully or in bad-faith by retaining Westminster as a second broker-dealer to secure investing clients.

Obex argues, though, that the Agreement should be construed to

---

[47]     *See* Contract ¶ 6(b).

[48]     *See id.*

[49]     *See* 9/14/11 Pre-Motion Conference at 8:25-9:5.

12

include investments that were obtained through Westminster because Westminster was an Obex Party.[50]  However, even if Obex introduced Westminster to Healthzone, Westminster itself never invested in Healthzone, and so it cannot be an Obex Party.  In fact, it emerged during depositions that contracts in the financial services industry sometimes employ an explicit provision regarding placement fees on investments obtained "indirectly" to cover situations like this one.[51]  Such language is, however, notably absent from the Agreement.  Furthermore, Obex cannot rely on the anti-circumvention clause in the Agreement because the plain language of that clause makes clear that it was intended to apply to investments that were made by Obex Parties even after the Agreement was terminated.[52]  Thus, the anti-circumvention clause has no application where, as here, a broker-dealer other than Obex has introduced an investor to Healthzone.

### B.    Obex Has Not Shown Any Entitlement to Placement Fees

To succeed on summary judgment, it is sufficient for a party to point

---

[50]    *See, e.g.*, Rooney Tr. at 181:6-23.

[51]    *See* Katzenstein Tr. at 249:5-17.

[52]    *See* Contract ¶ 6(b); *see also* Healthzone's Memorandum of Law in Further Support of Its Motion for Summary Judgment at 6.  Healthzone refers to this clause somewhat more aptly as a "tail clause."  *See id.*

13

to the other party's lack of evidence.[53]  Healthzone has thus met its burden here by showing that Obex has not even alleged that Westminster — which was introduced to Healthzone by Obex — invested in Healthzone, or that Obex introduced any other party to Healthzone.  Therefore, there are no investment funds that would entitle Obex to placement fees.  Inasmuch as the Court must construe the language of a contract, and because I find that the Agreement was clear and unambiguous, there are no additional questions of fact which would require a trial.

## VI.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.  The Clerk of the Court is directed to close this motion [Docket No. 31] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 2, 2011

---

[53]      *See Cordiano*, 575 F.3d at 204.

14

- Appearances -

**For Plaintiff:**

Thomas Christopher Jardim, Esq.
Richard S. Meisner, Esq.
Berman, Sauter, Record & Jardim, P.C.
140 Broadway, 46th Floor
New York, NY 10005
(212) 208-1436

**For Defendant:**

Barry R. Lax, Esq.
Gabrielle J. Pretto, Esq.
Lax & Neville, LLP
1412 Broadway, Suite 1407
New York, NY 10018
(212) 696-1999

Brian J. Neville, Esq.
Law Offices of Brian Neville
225 Broadway, Suite 1200
New York, NY 10007
(212) 732-7179

Brian D. Maddox, Esq.
Venable LLP
1270 Ave of the Americas
New York, NY 10020
(212) 307-5500